**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sam Sobh, | No. CV-19-05277-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Phoenix Graphix Incorporated, et al., | |
| Defendants. | |

Plaintiff Sam Sobh believes he was entitled to a "hardship distribution" from the pension plan he participated in while employed by Defendant Phoenix Graphix Inc. The parties disagree about which version of that plan applied to Sobh's request for a distribution. According to Sobh, the 2001 version applied and entitled him to a hardship distribution. According to Phoenix Graphix, the 2016 version applied and Sobh was properly denied a hardship distribution. For purposes of Sobh's claim for benefits under the terms of the plan, Phoenix Graphix is correct. Sobh may, however, be entitled to other remedies under his remaining claims.

## BACKGROUND

The following facts are undisputed. It is simplest to recite the history of the plan before addressing Sobh's circumstances.

**A. Profit Sharing Plan**

In 2001, Phoenix Graphix adopted the "PGI/Phoenix Graphix, Inc. Profit Sharing Plan" (the "Plan"). (Doc. 33-1 at 1). The 2001 Plan allowed Phoenix Graphix to make an

"employer contribution" to the Plan which was then allocated to individual employees' accounts pursuant to a formula. (Doc. 32-1 at 16). As relevant here, the 2001 Plan allowed for two types of distributions to participants. First, a participant could elect a "cash-out" distribution. (Doc. 32-1 at 5, 29). A "cash-out" distribution would be made "no later than the end of the first Plan Year following" a participant's termination from employment. (Doc. 32-1 at 5). Second, a participant could "apply in writing to the Administrator for a hardship withdrawal of part or all of his net distributable amount." (Doc. 32-1 at 29). The 2001 Plan defined "Participant" as "every Employee or former Employee." (Doc. 32-1 at 11). Thus, the 2001 Plan allowed for a hardship distribution to a "former Employee."

"The 2001 Plan was restated and amended with an effective date of January 1, 2008." (Doc. 33-1 at 2). The 2008 Plan made numerous changes but the basic structure remained the same. That is, the 2008 Plan allowed Phoenix Graphix to make contributions which were allocated to participants' accounts. (Doc. 32-1 at 78). The 2008 Plan did, however, make changes to the hardship distribution provision. In the 2008 Plan, the option of "hardship withdrawals" was listed under the section titled "Inservice Distribution and Loans." (Doc. 32-1 at 101). And the 2008 Plan stated a "Participant" could receive a hardship withdrawal with "Participant" defined as an individual employed by Phoenix Graphix. (Doc. 32-1 at 100, 70, 65-66). Thus, the 2008 Plan rendered former employees ineligible for hardship distributions.

Finally, "[i]n March 2016, the 2008 Plan was restated and amended with an effective date of January 1, 2016." (Doc. 33-1 at 2). The 2016 Plan consisted of an "Adoption Agreement" containing check-the-box options and a "Basic Plan Document" containing the substantive provisions. The "Adoption Agreement" stated "hardship withdrawals" were allowed but they were listed under a section titled "In-Service Withdrawals." (Doc. 32-1 at 183-84). Similarly, the Basic Plan Document listed "hardship withdrawals" under the section titled "In-Service Distributions and Loans." (Doc. 32-1 at 251). The relevant provision stated "[a] Participant may receive a distribution on account of hardship." (Doc. 32-1 at 251). "Participant" was defined as "an Eligible Employee who participates in the

Plan." (Doc. 32-1 at 206). And "Eligible Employee" was defined as "any Employee employed by the Company." (Doc. 32-1 at 203).

In light of the hardship distribution provision being listed under "In-Service Distributions" and the applicable definitions, the 2016 Plan appears to not allow hardship distributions to former employees. However, the 2016 Plan did allow for an individual to receive a distribution of his account balance upon his "Termination of Employment," a term that was defined as "any absence from service that ends the employment of the Employee with the Employer." (Doc. 32-1 at 240, 210). Thus, a former employee *could* receive his account balance, he just could not have that distribution labeled a "hardship distribution."[1]

There was a Summary Plan Description ("SPD") prepared in connection with the 2016 Plan. (Doc. 32-1 at 137). The SPD explained an individual was "entitled to receive a distribution from your Account after you terminate employment." (Doc. 32-1 at 145). In a section titled "In-Service Distributions and Loans," the SPD explained an individual "may receive a distribution on account of hardship." (Doc. 32-1 at 146). And the SPD also stated "Only Employees are eligible to receive in-service distributions." (Doc. 32-1 at 147). Thus, the SPD indicated former employees were not eligible for hardship distributions.

**B. Sobh's Employment and Requests for Distribution**

In approximately 2009, Sobh began working for Phoenix Graphix. At some point prior to 2016, Sobh began participating in the Plan. On March 28, 2016, the President of Phoenix Graphix, Brian Kotarski, sent an email to Sobh and other employees. The subject of that email was "Profit Sharing Plan" and the email stated the employees had already received the Plan's Annual Notice, a Beneficiary Designation Form, and a Wage Deferral Agreement Form. The email instructed the employees to fill out and return the Beneficiary

---

[1] As explained by Phoenix Graphix, identifying a distribution as a "hardship distribution" may allow a participant to avoid a 10% tax penalty. (Doc. 33 at 10). Given Sobh's account balance of approximately $35,000, his insistence on taking a hardship distribution instead of a non-hardship distribution means he is seeking to avoid, at most, an additional tax liability of approximately $3,500.

Designation Form.  Sobh responded to that email with a series of questions such as "Are we withdrawing the money from the current plan and starting a new elective deferrals program under a new plan?" (Doc. 32-1 at 280).  Sobh also requested a "copy of the SPD." From the content of Sobh's email it is clear he knew changes were being made to the Plan as of 2016.

In approximately July 2018, Sobh stopped working for Phoenix Graphix.  The parties do not provide the circumstances of Sobh's departure, but it appears he left on bad terms.  (Doc. 29-2, 28-12 at 3).  On August 14, 2018, Sobh sent an email to Kotarski.  That email stated, in relevant part:

> I'm sending you this email to officially request a release of my Profit Sharing vestings.  I'm going thru financial hardship; Therefore, I need to exit out of the plan and transfer the vesting to my personal bank account.

(Doc. 32-1 at 282) (all errors in original).  Sobh sent a similar email a few hours later. (Doc. 32-1 at 283).  Kotarski responded to those emails the next day, stating:

> The "plan" is very "legal" and no exceptions can be made. The Plan states;
>
> **Time & Form of Payment**
>
> 3. **Time of Payment (Other than Death)**
>
> Distributions after Termination of Employment for reasons other than death shall commence (Section 7.02):
>
> a. [ ] Immediate. As soon as administratively feasible with a final payment made consisting of any allocations occurring after such Termination of Employment
>
> b. [X] End of Plan Year. As soon as administratively feasible after all contributions have been allocated relating to the Plan Year in which the Participant's Account balance becomes distributable
>
> c. [ ] Normal Retirement Date.
>
> d. [ ] Other: _____
>
> The Profit Sharing plan administration for any given/calendar year is completed the following March/April (2019; in this case). Distribution will be made in accordance with your direction at that time.

(Doc. 32-1 at 284).  The "Time & Form of Payment" portion of that email was from the "Adoption Agreement" for the 2016 Plan.  That portion of the Adoption Agreement bears no resemblance to any provision of the 2001 Plan.  Around the time Sobh and Kotarski were exchanging emails, Sobh obtained counsel.  That counsel began corresponding with counsel for Phoenix Graphix.  Sobh also continued directly emailing Kotarski.

On September 17, 2018, Sobh emailed Kotarski again, stating:

> This is my forth and last official request to pull my investment money/share from the profit sharing plan.
>
> I'm living in a sever financial hardship and I need to receive my money to pay bills.

(Doc. 32-1 at 286) (all errors in original). A few days later, Sobh's counsel emailed Phoenix Graphix's counsel to explain "Sobh has requested . . . a hardship withdrawal from the Plan." (Doc. 32-1 at 288). Sobh's counsel then cited provisions of the 2001 Plan that governed the circumstances under which a hardship distribution was permissible. Phoenix Graphix's counsel responded "[t]he actuary for the Plan advises that Mr. Sobh does not qualify for the hardship distribution because that applies to participants who are actively employed." (Doc. 28-6 at 2).

**C. Sobh's First Litigation**

On November 14, 2018, Sobh filed his first suit against Phoenix Graphix. (Doc. 1 in CV-18-4073). That suit alleged Sobh had "requested that his benefits under the [Phoenix Graphix] Plan be cashed out" but the "request was denied." Based on that denial, Sobh alleged a claim for "Improper Denial of Plan Benefits - ERISA § 502(a)(1)(B)." The complaint alleged other claims under ERISA as well as a state-law claim for unpaid wages.

On January 30, 2019, Phoenix Graphix's counsel sent a letter to Sobh's counsel regarding the complaint. That letter explained Sobh's cause of action seeking a "cash-out" distribution was barred by the applicable plan documents. The letter referenced and attached the 2001 Plan and the 2016 SPD. (Doc. 28-7 at 2). Relying on the 2001 Plan, the letter explained Sobh was entitled to a "cash-out" distribution but that distribution would not be paid until "March or April of this year (2019)." (Doc. 28-7 at 3). In other words, Phoenix Graphix's counsel interpreted Sobh's claim for "benefits" under the Plan as a request that he receive a "cash-out" distribution, not that Sobh receive a hardship distribution.

On February 15, 2019, Phoenix Graphix's counsel sent another letter to Sobh's counsel. That letter included all the documents necessary for Sobh to receive a "cash-out"

- 5 -

distribution. If executed, those documents would have allowed Sobh to receive all the funds in his account. Thus, the letter argued Sobh's pending claim for benefits in the lawsuit was "moot." (Doc. 28-8 at 3). Sobh disagreed and did not withdraw his claim. On February 19, 2019, Phoenix Graphix filed a motion to dismiss.

In seeking dismissal of Sobh's claim for unpaid benefits, the motion to dismiss argued "the applicable plan documents barred Mr. Sobh from cashing out his benefits before the end of 2018." (Doc. 12 in CV-18-4073). In support, the motion cited to the "Master Plan Document" of the 2001 Plan. The motion also cited to the 2016 SPD. According to the motion to dismiss, those documents explained a terminated employee was entitled to receive his balance from the Plan "as soon as administratively feasible in the Plan Year following the Plan Year of termination of employment." (Doc. 12 at 3 in CV-18-4073). As had counsel's correspondence with Sobh, the motion to dismiss continued to interpret Sobh's request for benefits as a request for a "cash-out" distribution, *i.e.* not a hardship distribution.

In his opposition to the motion to dismiss, Sobh explained he was seeking a hardship distribution. (Doc. 15 in CV-18-4073). Sobh cited the 2001 Plan as authorizing a hardship distribution, even to a former employee. The reply then pointed out the 2001 Plan differentiated between a "cash-out" and a "hardship distribution." The reply argued the complaint had asserted a claim seeking a "cash-out" distribution, not a "hardship distribution."

On August 22, 2019, District Judge Lanza granted the motion to dismiss. In doing so, Judge Lanza cited extensively to the 2001 Plan and explained the allegations in the complaint were that Sobh was seeking a "cash-out" not a "hardship distribution." Because the complaint itself had not sought a "hardship distribution," the claim for benefits was dismissed. The other claims were also dismissed. Sobh was granted leave to file an amended complaint by September 13, 2019, but he did not do so. Thus, a judgment of dismissal without prejudice was entered.

### D. Second Litigation

On September 9, 2019, shortly before his first case was dismissed, Sobh sent an email to Kotarski again requesting he be allowed "to withdraw [his] funds under the Hardship withdrawal term." (Doc. 28-12 at 8) (capitalization in original). Sobh's counsel then sent a copy of that email to Phoenix Graphix's counsel. Sobh's counsel explained Sobh had "made it clear . . . that he would like to request the distribution as a hardship." (Doc. 28-12 at 7). On September 13, 2019, Sobh's counsel sent another email to Phoenix Graphix's counsel stating Sobh was "adamant in his request for a hardship distribution." (Doc. 28-12 at 5). Sobh's counsel explained it was "really an issue of . . . tax liability." (Doc. 28-12 at 5). The attorneys continued to exchange emails for the next few days. On September 17, 2019, Sobh's counsel sent an email to Phoenix Graphix's counsel stating "we have the Master Plan Document . . . that is apparently from 2001, and the summary plan document from 2016." Sobh's counsel asked for "the current master plan document." (Doc. 28-12 at 3). That same day, Sobh emailed Kotarski asking for, among other things, "Plan Documents" and "Plan Trust Documents." (Doc. 28-10 at 2).

On September 18, 2019, Phoenix Graphix's counsel emailed Sobh's counsel saying "Attached is what I understand is the current master plan document." Strangely, the attached document was the 2001 Plan. (Doc. 28-12 at 2). On September 26, 2019, Sobh filed the present suit. Sobh attached a copy of the 2001 Plan and alleged he was entitled to a hardship distribution under its terms. (Doc. 1 at 3). Phoenix Graphix moved to dismiss, arguing the complaint did not allege facts establishing Sobh was suffering a qualifying "hardship." To be precise, Phoenix Graphix argued Sobh was not entitled to a hardship distribution under the terms of the 2001 Plan. Phoenix Graphix did not argue Sobh's claim was based on an outdated version of the Plan. Before the Court could rule on the motion to dismiss, Sobh filed an amended complaint. (Doc. 13). The amended complaint, filed on November 8, 2019, again relied on the 2001 Plan. The amended complaint included allegations regarding Sobh's financial difficulties and alleged he was entitled to a hardship distribution pursuant to the terms of the 2001 Plan.

On November 18, 2019, Phoenix Graphix's counsel sent a letter to Sobh's counsel. That letter explained the 2001 Plan was no longer in effect as it had been restated in 2016. (The letter did not reference the 2008 Plan.) Phoenix Graphix then claimed the terms of the 2016 Plan were that former employees were not entitled to hardship distributions. Thus, the letter argued Sobh's pending claim for a hardship distribution was "not viable as a matter of law." (Doc. 28-13 at 3). This letter appears to have been the first time Sobh was explicitly informed the 2001 Plan had been replaced by the 2016 Plan. That letter did not change the parties' positions and, on December 17, 2019, Sobh filed a second amended complaint. (Doc. 20).

Sobh's second amended complaint alleges five claims:

1. Improper denial of plan benefits under ERISA § 502(a)(1)(B);
2. Declaratory Relief;
3. Breach of fiduciary duty under ERISA § 502(a);
4. Violation of ERISA § 502(c) for not providing documents in timely manner; and
5. Improperly retained wages under A.R.S. § 23-350.

The first cause of action for plan benefits is still premised on the 2001 Plan because, according to Sobh, that was the version "cited to [Sobh] and produced by [Phoenix Graphix] at the time of the requests for the distribution." (Doc. 20 at 12). In its answer to the complaint, Phoenix Graphix denied the 2001 Plan governed and alleged the 2016 Plan was the applicable version. (Doc. 21). The Court held a scheduling conference and set a briefing schedule solely on the first claim seeking benefits under the Plan.

On April 1, 2020, Sobh filed a motion for summary judgment as well as a "Motion for Determination of the Administration Record." The latter motion argues the decision to deny Sobh a hardship distribution must have been made under the 2001 Plan because that was the version repeatedly referenced by the parties in emails and briefs during the previous lawsuit. Sobh requests the Court "remove[] from the Administrative Record" all documents indicating something other than the 2001 Plan applies. (Doc. 28 at 10). As for Sobh's motion for summary judgment, that motion presents arguments under the terms of

the 2001 Plan.

Phoenix Graphix opposes the motion to remove documents from the administrative record and its own motion for summary judgment argues that, under the terms of the 2016 Plan, Sobh was properly denied a hardship distribution. (Doc. 33). Therefore, Phoenix Graphix argues it is entitled to summary judgment on Sobh's claim for benefits. All of the parties' motions are now fully briefed.

## ANALYSIS

The parties' present disputes boil down to a single question: which version of the Plan should apply to Sobh's claim for benefits pursuant under ERISA § 502(a)(1)(B)? Sobh believes the 2001 Plan should apply while Phoenix Graphix believes the 2016 Plan should apply. While the present circumstances are unusual, the 2016 Plan applies.

**I. Sobh's Claim Pursuant to ERISA § 502(a)(1)(B)**

According to Phoenix Graphix, the 2016 Plan must apply because Sobh "had no vested rights in the 2001 Plan" and "employers are free under ERISA, for any reason, at any time, to adopt, modify, or terminate welfare plans." (Doc. 33 at 6). In support of these arguments Phoenix Graphix cites Ninth Circuit authority stating the version of a *welfare* plan in effect when benefits are denied applies to a lawsuit seeking benefits. (Doc. 33 at 6) (citing *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160 (9th Cir. 2001). The Plan, however, is not a welfare plan, it is a pension plan. *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1069 n.5 (9th Cir. 2005) ("ERISA governs two types of employee benefit plans: (1) 'pension' benefit plans and (2) 'welfare' benefit plans."). And there are substantial differences between the two types of plans. Of relevance for this case, ERISA dictates that benefits under a pension plan *do* vest. Benefits under a welfare benefit plan "need never vest." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160 (9th Cir. 2001). A situation involving a claim for vested benefits, such as benefits under a pension plan, may require application of a version of a plan no longer in effect. A case cited by Phoenix Graphix establishes this point, even in the context of a welfare benefit plan.

In *Shane v. Albertson's Inc.*, 504 F.3d 1166, 1168 (9th Cir. 2007), an employee participated in her employer's disability plan. In 2000, the employee became disabled and began receiving disability benefits. At that time, the governing plan was the "1993 Disability Plan." That plan provided "[a]ny amendment to the Plan shall be effective only with respect to Total Disabilities which commence on and after the effective date of the amendment." *Id.* In February 2002, the employer amended the disability plan. The 2002 Plan, however, stated "Total Disabilities commencing prior to the effective date of a Plan amendment are to be provided for under the terms of the Plan in effect at the time those disabilities commenced." *Id.* at 1169. In April 2003, the employer terminated the employee's benefits. *Id.* at 1168. When the employee sought continued payment of benefits, the parties disagreed whether the 1993 or 2002 version of the plan should apply to the employee's claim.

The Ninth Circuit held the claim for benefits had to be decided under the terms of the 1993 Plan. In reaching this conclusion, the panel explained a previous Ninth Circuit case had held a claim for benefits should be decided pursuant to the welfare plan in effect at the time the benefits were denied. But the panel stated that earlier case was premised on the employee's rights not being vested. *Id.* at 1169. Based on the language in the 1993 Plan and the 2002 Plan, the employee's rights had vested under the 1993 Plan. Therefore, the 1993 Plan had to be used when resolving the employee's later claim for benefits. *See Dallenbach v. Standard Ins. Co.*, No. 218CV02024GMNVCF, 2020 WL 1430036, at *4 (D. Nev. Mar. 24, 2020) (reading *Shane* as holding the employee's benefits vested under the 1993 Plan).

Under the reasoning of *Shane*, when benefits vest under a particular version of an ERISA plan, that version may apply to a subsequent claim for benefits. While *Shane* dealt with vested benefits under a welfare plan, the same result applies to a pension plan. In other words, an employee who accrues benefits under an ERISA-covered pension plan does not lose those benefits if his employer happens to change the plan's terms. Instead, regardless of subsequent amendments, a claim for pension benefits might have to be

resolved under the terms of an earlier plan.

Pursuant to ERISA, Sobh had vested rights under the Plan as soon as he made contributions to it or as soon as he met the vesting schedule for Phoenix Graphix's contributions on his behalf. *See* 29 U.S.C. § 1053(a)(1) (requiring "employee's rights in his accrued benefit derived from his own contributions are nonforfeitable" and requiring vesting schedule for "employee's accrued benefit derived from employer contributions"). Based on the parties' submissions, Sobh started working for Phoenix Graphix after the 2008 Plan went into effect. Accordingly, Sobh never accrued any benefits under the 2001 Plan. Sobh might be entitled to benefits under the 2008 Plan but he appears uninterested in that, perhaps because the 2008 Plan appears to forbid hardship distributions to former employees.

Instead of arguing the 2001 Plan was in effect during his employment, Sobh argues the 2001 Plan must apply because of Phoenix Graphix's behavior in repeatedly providing and citing the 2001 Plan in interactions with Sobh. As an initial matter, it is not accurate that Phoenix Graphix cited only the 2001 Plan to Sobh after he requested a distribution. In an email Kotarski sent to Sobh on August 15, 2018, Kotarski quoted from the Adoption Agreement for the 2016 Plan. Because the portions Kotarski quoted bear no resemblance to the 2001 Plan, Sobh likely either knew or should have known of the 2016 Plan at that time.[2] Given the August 2018 email, it is unclear why Sobh initially came to believe the 2001 Plan should apply.

It is true that Phoenix Graphix introduced some confusion by repeatedly citing and relying on the 2001 Plan before and during Sobh's first litigation. Sobh cites that behavior in his request that the Court use the 2001 Plan when resolving his claim for benefits. While not labeled as such, Sobh is effectively making an equitable estoppel claim. An equitable estoppel claim, however, is made pursuant to ERISA § 502(a)(3). *See Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 955-56 (9th Cir. 2014) (outlining elements for equitable

---

[2] Moreover, Sobh likely received a copy of the SPD for the 2016 Plan long before he made any request for a distribution. And that SPD places hardship distributions under a section labeled "In-Service Distributions and Loans" and states "Only Employees are eligible to receive in-service distributions." (Doc. 32-1 at 147). (Doc. 32-1 at 146).

- 11 -

estoppel in ERISA context). Equitable estoppel is not available for purposes of Sobh's claim pursuant to ERISA § 502(a)(1)(B). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 436 (2011) (holding ERISA § 502(a)(1)(B) "speaks of *enforc[ing]* the terms of the plan, not of *changing* them") (emphasis in original). Therefore, Sobh's assertion that misleading behavior by Phoenix Graphix mandates application of the 2001 Plan for purposes of his ERISA § 502(a)(1)(B) claim is not convincing.

Because the ERISA § 502(a)(1)(B) claim must be resolved under the terms of the 2016 Plan the question is whether the 2016 Plan allowed for a hardship distribution to a former employee. Before resolving that question, the Court must determine the appropriate standard of review to apply to Phoenix Graphix's decision that the 2016 Plan did not allow for such distributions.

The 2016 Plan contained a discretionary clause granting Phoenix Graphix "complete discretionary power and authority . . . to construe and interpret the provisions of the Plan." (Doc. 32-1 at 270). But "[e]ven when a plan confers discretion on an administrator, if that administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, its decision is subject to de novo review." *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1040 (9th Cir. 2014). The manner in which Sobh's various claims were handled qualifies under this exception.

Pursuant to the 2016 Plan, any claim denial should have included

> (1) the reason or reasons for such denial, (2) the pertinent Plan provisions on which the denial is based, (3) any material or information needed to grant the claim and an explanation of why the additional information is necessary, and (4) an explanation of the steps that the Claimant must take if he wishes to appeal the denial including a statement that the Claimant may bring a civil action under ERISA.

(Doc. 32-1 at 272). There is no evidence Phoenix Graphix complied with these requirements in denying Sobh's claims.[3] Moreover, it is not even clear Phoenix Graphix

---

[3] Phoenix Graphix argues Sobh's claim for benefits is barred by the statute of limitations. However, a claim for benefits "accrues either at the time benefits are actually denied, or when the insured has reason to know that the claim has been denied." *Withrow v. Halsey*,

- 12 -

was the entity who resolved Sobh's claims for benefits. At one point, Phoenix Graphix's counsel explained Sobh was not entitled to a hardship distribution because the "plan actuary" stated Sobh was not eligible. (Doc. 28-6 at 2). Phoenix Graphix, not the "plan actuary," should have been making that decision. Accordingly, for purposes of resolving the present motions, the Court concludes Phoenix Graphix's behavior during the administrative claim process requires application of the de novo standard of review.

Under a de novo review, the language of the 2016 Plan establishes Sobh was not entitled to a hardship distribution. The 2016 Plan listed "hardship withdrawals" under the section titled "In-Service Distributions and Loans." (Doc. 32-1 at 251). The 2016 Plan also stated "[a] Participant may receive a distribution on account of hardship" with "Participant" defined as an individual "employed by the Company." (Doc. 32-1 at 251, 203). There is no ambiguity in these provisions. At the time he requested a distribution, Sobh was not "employed" by Phoenix Graphix. Therefore, he was not eligible for a hardship distribution. Phoenix Graphix is entitled to summary judgment on Sobh's claim pursuant to ERISA § 502(a)(1)(B).

**II. Additional Proceedings**

Having resolved Sobh's claim for benefits, there are four remaining claims: declaratory relief; breach of fiduciary duty under ERISA § 502(a); violation of ERISA § 502(c) for not providing documents in timely manner; and improperly retained wages under A.R.S. § 23-350. The request for declaratory relief appears to be duplicative of the claim for benefits. The claim sought "declaratory relief confirming [Sobh's] rights under the PGI Plan." Given that Sobh is not entitled to benefits under the terms of the 2016 Plan, the declaratory relief claim also fails.

As for the three other claims, it is unclear how the parties wish to proceed. The parties will be required to confer and submit a joint statement. If either party believes discovery is appropriate, they shall submit a proposed discovery schedule.

---

655 F.3d 1032, 1036 (9th Cir. 2011). Given the manner in which Sobh's administrative claims were handled, in particular the failure to provide him a copy of the 2016 Plan and the failure to outline his appeal rights, it was not clear when his claim had been "finally denied." *Id.* Thus, for present purposes, the Court will treat the claim for benefits as timely.

Accordingly,

**IT IS ORDERED** the Motion for Determination of the Administrative Record (Doc. 28) and Motion for Summary Judgment (Doc. 29) are **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 33) is **GRANTED** on the claim pursuant to 29 U.S.C. § 1132(a)(1)(B) and the claim for declaratory relief.

**IT IS FURTHER ORDERED** no later than **December 16, 2020**, the parties shall confer and file a status report.

Dated this 8th day of December, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge